UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TANISHA MARTIN, | CASE NO. 1:22-CV-00857-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Tanisha Martin challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 24, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 4, 2022). The parties consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF #8). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this decision.

### PROCEDURAL BACKGROUND

Ms. Martin filed for SSI on April 14, 2020, alleging a disability onset date of March 12, 2016. (Tr. 380). The claim was denied initially and on reconsideration. (Tr. 381-87, 388-93). Ms.

1

Martin then requested a hearing before an administrative law judge. (Tr. 409). Ms. Martin (represented by counsel) and a vocational expert (VE) testified before the ALJ on February 24, 2021. (Tr. 321-53). On April 8, 2021, the ALJ issued a written decision finding Ms. Martin not disabled. (Tr. 301-20). In the decision, the ALJ cited the existence of a prior unfavorable ALJ decision, issued February 27, 2019, and declined to reopen the decision. (Tr. 305). Therefore, the ALJ considered evidence only from the un-adjudicated period beginning February 28, 2019, through the date of the decision, and determined Ms. Martin was not disabled. (*Id.* at 304-15). The Appeals Council denied Ms. Martin's request for review, making the hearing decision the final decision of the Commissioner. (Tr.1-7; *see* 20 C.F.R. §§ 416.1455 and 416.1481). Ms. Martin timely filed this action on May 24, 2022. (ECF #1).

## Factual Background

### I.    Personal and Vocational Evidence

Ms. Martin was 38 years old on her alleged onset date, and 43 years old at the administrative hearing. (Tr. 328, 381). She has an associate degree in human service management. (Tr. 329). She does not have any past relevant work.

### II.    Relevant Medical Evidence

#### A.    Physical Impairments

Ms. Martin's hand X-rays, taken June 4, 2019, revealed mild bilateral osteoarthritis at the first carpometacarpal joints and minimal osteoarthritis involving the first through third metacarpophalangeal joints in the right hand and first metacarpophalangeal joints in the left hand. (Tr. 887). On June 4, Ms. Martin met with Anthony J. Clavarella, PA-C, in the orthopedic surgical department to discuss numbness and tingling in her middle finger, worse on the right. (Tr. 630).

2

Ms. Martin endorsed three prior carpal tunnel injections, each of which helped for a short period of time. (*Id.*). Neurologic evaluation revealed bilateral positive Tinel's signs, a positive Phalen's sign on the right, and an equivocal Phalen's sign on the left. (Tr. 631). Otherwise, physical examination was unremarkable. (*Id.*). PA Clavarella ordered a bilateral EMG test to determine the severity of her probable bilateral carpal tunnel syndrome. (Tr. 632).

Ms. Martin returned to the orthopedic surgeon's office on July 18, 2019 to discuss the results of the EMG, which revealed bilateral median neuropathies at or distal to the wrists, consistent with a clinical diagnosis of carpal tunnel syndrome, moderate in degree electrically, left side slightly worse, with chronic denervation of bilateral abductor pollicis brevis muscles, without active denervation. (Tr. 639). Ms. Martin was referred to Joseph Styron, M.D., for a surgical consultation. (*Id.*). Ms. Martin underwent right-sided carpal tunnel release surgery on November 7, 2019 (Tr. 689) and left-sided release surgery on November 21, 2019. (Tr. 685).

On September 25, 2020, Michael Milicia, a licensed and registered occupational therapist, evaluated Ms. Martin's physical capacity. (Tr. 1918). The administrative transcript contains the summary cover letter of the results of the evaluation. (Tr. 1919). According to the cover letter, there is a detailed report of the evaluation, but the detailed report is not included in the administrative transcript. (*Id.*). The evaluation lasted over two and a half hours. (*Id.*). The summary of the evaluation revealed the following:

> A Physical Residual Functional Capacity Assessment was conducted on 9/25/2020 to determine Ms. Martin's tolerance to perform work tasks.
>
> Consistency of Effort results obtained during testing indicate Ms. Martin put forth full effort. Reliability of Pain results obtained during testing indicate pain could have been considered while making functional decisions.

3

Ms. Martin demonstrated the ability to perform within the LIGHT Physical Demand Category based on the definitions developed by the US Department of Labor and outlined in the Dictionary of Occupational Titles. Ms. Martin lifted 20 pounds to below waist height. Ms. Martin carried 20 pounds. Pushing abilities were evaluated and Ms. Martin pulled 35 horizontal force pounds and pushed 35 horizontal force pounds respectively.

Sitting and standing abilities are based on observing this person's sit/stand abilities throughout this evaluation and comparing this to various questions asked of Ms. Martin. During this evaluation, Ms. Martin was noted to sit for a total of 1 hour and 9 minutes. During this evaluation, Ms. Martin was noted to stand for a total of 35 minutes and, before requiring a change of position, she was noted to stand for 10 minutes at one time. Based on the sitting observation and taking into account full time work she is able to perform sitting for up to 8 hours total during a work day. Based on standing observation and taking into account full time work she is able to perform standing for up to 4 hours and 32 minutes total during a work day and 15 minutes at one time before requiring a change of position.

Non-material handling testing indicates Ms. Martin demonstrates occasional tolerance for static balance, repetitive kneeling, simple grasping, squatting, stair climbing, and walking. Ms. Martin demonstrated the ability to perform above shoulder reaching, bending, forward reaching, gross coordination, and pinching with frequent tolerance. Fine coordination was demonstrated on a constant basis. The functional activities Ms. Martin should avoid within a competitive work environment include dynamic balancing and firm grasping.

Musculoskeletal exam results as outlined in the Full Capacity Evaluation report.

(*Id.*).

On October 5, 2020, Ms. Martin saw the occupational therapist for therapy evaluation. (Tr. 1922). On that day, her chief complaint was left-hand weakness, stiffness, and occasional edema. (*Id.*). She complained of difficulty gripping for sustained periods, endorsed being unable to complete mopping, sweeping, and vacuuming in the same day, and stated she was unable to wring out a mop and fatigued with squeezing bottles. (Tr. 1923-24). Objective testing revealed a weaker left-handed grip and pinch strength than the right. (Tr. 924).

4

On October 13, 2020, Ms. Martin had a second occupational therapy session during which she demonstrated improved tolerance of hand exercises. (Tr. 1927). Ms. Martin endorsed continued hand fatigue when holding dishes to wash them and reported continued left ring finger stiffness. (*Id.*).

On October 27, 2020, during her third physical therapy session, Ms. Martin stated she has some ulnar pain with the exercises that resolves afterward, continues to have pain in her palms when she bears weight on them, and still drops items from her left hand when she gets fatigued. (Tr. 1930). Otherwise, Ms. Martin endorsed controlling the edema with elevation. (Tr. 1930).

On November 10, 2020, Ms. Martin had a fourth visit with the occupational therapist. (Tr. 1952). While she demonstrated no improvement in pinch strength, Ms. Martin showed improvement in left hand grasp strength and symptom management. (*Id.*). Ms. Martin reported returning to most of her normal activities and she has been better with pacing. (Tr. 1953).

Ms. Martin was discharged from occupational therapy after her fifth visit on November 17, 2020 "due to goal achievement and maximal benefit." (Tr. 1956). She reported improved activity tolerance for manual tasks and coordination exercises. (Tr. 1957). Again, Ms. Martin had not achieved increasing her pinch strength, but met other goals. (Tr. 1956).

### B.    Mental Impairments

Ms. Martin has a long-standing history of mental health treatment and medication adjustments for major depressive disorder, generalized anxiety disorder with panic disorder, and a binge-eating disorder. (*See* Tr. 561-618).

On April 14, 2020, Ms. Martin also spoke with Jane Ahern, LPCC-S, of Circle Health Services, during a telehealth appointment. (Tr. 1117). She felt "pretty decent" that day and

attributed this to sleeping well the prior night. (*Id.*). She endorsed a poor sleep pattern, sometimes not falling asleep until 4:00 a.m. because her thoughts are racing. (*Id.*). When asked, Ms. Martin responded that telehealth therapy is more comfortable for her because she does not have to leave her home and travel on the bus. (Tr. 1118).

On April 28, 2020, Ms. Martin spoke with Erin Murphy, APRN, CNP, of Circle Health Services, during a telehealth appointment. (Tr. 1114). Ms. Martin stated trazadone 50 mg was too sedating and endorsed taking half, which worked better for her. (*Id.*). Ms. Martin used to take gabapentin at night, but experienced sleep paralysis and nightmares. (*Id.*). When she stopped taking gabapentin at night for a week, the nightmares stopped. (*Id.*). She continues to use gabapentin during the day. (*Id.*). Ms. Martin endorsed getting seven to ten hours of intermittent sleep at night. (Tr. 1115). She requested medication to help regulate her sleep better. (*Id.*). Ms. Martin reported her primary care physician ordered an at-home sleep study, but insurance denied it; Ms. Martin does not believe she could complete an in-clinic sleep study. (*Id.*). She continued to endorse not leaving her room for days at a time. (*Id.*). Mental status examination revealed generally relaxed, engaged, and cooperative behavior; unremarkable thought content and process; unremarkable perceptions; appropriate insight and judgment; grossly intact memory; and average intellect.[1] (Tr. 1116). NP Murphy continued prescriptions for Viibryd, gabapentin, and trazadone. (*Id.*).

On that day, Ms. Martin also spoke with Jane Ahern, LPCC-S, of Circle Health Services, during a telehealth visit and stated the medication is helping her sleep a full night on a normal

---

[1]     Mental status examinations throughout her mental health treatment records are largely similar. (*See* Tr. 1109, 1616-17, 1627, 1827 1831)

schedule and she does not need to nap during the day. (Tr. 1112). As a result, she endorsed feeling less rushed to get things accomplished. (*Id.*). Ms. Martin also endorsed improved concentration, being more productive, crying less, feeling less tired, and feeling less anxiety after cutting down on news consumption. (*Id.*). She did not complain of medication side effects except she feels "a little bit slow" when she awakens. (*Id.*).

On May 13, 2020, Ms. Martin had a telehealth appointment with Counselor Ahern, where she described a conversation with her father as "emotionally draining." (Tr. 1110).

On May 26, 2020, Ms. Martin had a telehealth appointment with NP Murphy. (Tr. 1107). She complained of having a difficult time getting out of bed and endorsed feeling anxiety at the prospect of making medical appointments because she is afraid to go out. (Tr. 1108). NP Murphy noted Ms. Martin was able to go grocery shopping but gets irritated when others do not wear masks. (*Id.*). NP Murphy continued her prescribed medications. (Tr. 1109).

On June 9, 2020, Ms. Martin had a telehealth appointment with Counselor Ahern, where she presented with an anxious mood but reported feeling better than last week. (Tr. 1628-29). Ms. Martin endorsed stopping her medications because she was feeling better but started again "yesterday" and asked if she could take the medication on an as-needed basis. (Tr. 1629). Counselor Ahern expressed the importance of taking medical daily as prescribed. (Tr. 1630). Ms. Martin endorsed social anxiety since childhood and reported that when she meets someone for the first time, she feels shaky inside, and her mind goes blank. (*Id.*).

On June 23, 2020, Ms. Martin had a telehealth appointment with NP Murphy. (Tr. 1624). There, Ms. Martin expressed frustration that her disability application was denied, stating they did not focus on the important issues like her need for three days to work up the energy to shower.

(Tr. 1625). Ms. Martin stated she stopped her medication about two weeks ago because her nephew hid her antidepressants and when she found them a couple days later, the medication caused headaches. (Tr. 1626). She started taking half the dosage for three days, but the headaches did not resolve so she stopped taking the medication entirely. (*Id.*). NP Murphy restarted prescriptions for Viibryd and trazodone, but deferred prescribing gabapentin because Ms. Martin said her primary care physician prescribes it for her neuropathy. (Tr. 1627).

That same day, Ms. Martin had a telehealth appointment with Counselor Ahern, where she described a severe panic attack occurring over the weekend. (Tr. 1622). Ms. Martin endorsed not taking her medications for two weeks, but that NP Murphy had restarted her Viibryd at a lower dosage. (Tr. 1622-23).

Ms. Martin had another telehealth appointment with Counselor Ahern on July 21, 2020, where she presented with an anxious and panicky mood and endorsed "an inability to think due to anxiety." (Tr. 1635). Ms. Martin endorsed feeling calmer after Counsel Ahern engaged her in diaphragmatic breathing exercises. (Tr. 1636). She saw Counselor Ahern again on July 28 and reported feeling a lot better than at her previous appointment. (Tr. 1638). She expressed frustration with her primary care provider, who pushed Ms. Martin to consider transferring her mental health treatment to a Cleveland Clinic facility. (Tr. 1639). Ms. Martin explained to her primary care physician that she had built trust with her mental health providers and did not want to change. (*Id.*). Ms. Martin acknowledged she got very angry, was rude to her physician, did not take in what the doctor said because she "shut down," and stayed in her room the rest of the day. (*Id.*).

On August 4, 2020, Ms. Martin had another telehealth appoint with Counselor Ahern. (Tr. 1833). There, she expressed feeling "very shaky" and that her stomach has "been in knots" the past few days because she needed to complete outstanding paperwork in relation to her disability claim and to send a fax. (Tr. 1833-34).

On August 10, 2020, Ms. Martin had a telehealth appointment with NP Murphy. (Tr. 1829). She expressed the same shakiness about paperwork deadlines; NP Murphy helped Ms. Martin complete some of her paperwork at this appointment. (Tr. 1830). Ms. Martin stated her physician stopped prescribing gabapentin because it was not helping with leg pain; though she does not believe the gabapentin adequately controlled her anxiety and depression, she feels worse without it. (*Id.*). NP Murphy noted Ms. Martin presented as anxious and had concerns about her ability to care for herself and her low threshold for stressors. (Tr. 1831). NP Murphy continued Viibryd, restarted gabapentin, and increased the dosage of trazodone for sleep. (Tr. 1832).

On August 24, Ms. Martin saw NP Murphy for another telehealth appointment. (Tr. 1825). There, she endorsed sleeping better with the increased dosage of trazodone but feels groggy for about two hours in the morning. (Tr. 1826). Ms. Martin wanted to change her prescription for Viibryd and expressed feeling irritable, crying often, feeling said continuously, feeling a lack of motivation, and isolating. (*Id.*). She endorsed feeling panicky from "out of the blue," and feeling overwhelmed at the prospect of putting money on her laundry card, attending this telehealth appointment, and making dinner. (*Id.*). She took a gabapentin, which helped to take the edge off. (*Id.*). NP Murphy ordered Ms. Martin to decrease her Viibryd for two weeks, discontinue the medication entirely after two weeks at the lower dosage, and then begin taking amitriptyline. (Tr. 1828).

On September 9, 2020, Ms. Martin had a telehealth appointment with Counselor Ahern. (Tr. 1823). There, the counselor noted Ms. Martin was initially "very sleepy," a side effect of the amitriptyline. (*Id.*). She reported feeling less anxious and sleeping through the night. (*Id.*). Counselor Ahern focused on helping reduce Ms. Martin's fear of leaving her home. (*Id.*).

On September 21, 2020, Ms. Martin had a telehealth appointment with NP Murphy. (Tr. 1842). Ms. Martin described feeling irritable but sleeping better with amitriptyline. (*Id.*). She endorsed "a couple panic attacks" in September, including one severe attack that left her drained and caused her to sleep most of the next day. (*Id.*). Ms. Martin can go to Save-A-Lot by herself but needs her mother to go with her to any other stores. (*Id.*). Ms. Martin stated she can be separated from her mother, such as being in a different aisle, for five minutes at the most. (*Id.*). She has a "full-blown" panic attack if she cannot find her mother in the store. (*Id.*). NP Murphy continued amitriptyline and discontinued gabapentin and trazodone. (Tr. 1844).

## III.  MEDICAL OPINIONS

On June 8, 2020, State agency medical consultant Maria Congbalay, M.D., reviewed Ms. Martin's medical records dated up to November 21, 2019, and adopted the RFC rendered in the prior decision: medium work; never climb ladders, ropes, or scaffolds; frequently climb stairs and stairs, stoop, kneel, crouch, and crawl; frequently handle and finger bilaterally; and avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 385). Likewise, State agency consultant Cynthia Waggoner, Psy.D., reviewed Ms. Martin's mental health records up to June 2, 2020, and adopted the mental RFC rendered in the prior decision: limited to routine tasks without strict time demands; no strict production quotas; no more than routine and predictable changes in the work setting; and no direct work-related interaction with the

public, occasionally interaction with supervisors, and occasional superficial interaction with coworkers. (Tr. 384). The State agency consultants determined Ms. Martin was not disabled. (Tr. 386).

An August 10, 2022 medical source statement, presumably from NP Murphy, concluded Ms. Martin has severe major depressive disorder that, when exacerbated, keeps her from performing activities of daily living. (Tr. 1690). In addition, Ms. Martin's social anxiety usually triggers panic that makes it difficult for her to leave her room or complete an interview over the phone. (*Id.*). NP Murphy determined Ms. Martin would have extreme limitations in changing activities or work settings without being disruptive and sustaining an ordinary routine and regular attendance at work. (*Id.*). She also determined Ms. Martin would have marked limitations in understanding and learning terms, instructions, or procedures; asking and answering questions and providing explanations; sequencing multi-step problems; asking for help when needed; handling conflicts with others; initiating or sustaining conversations; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; completing tasks in a timely manner; working a full day without needing more than the allotted number or length of rest periods during the day; responding to demands; adapting to changes; managing her psychologically based symptoms; and maintaining personal hygiene and attire appropriate to a work setting. (Tr. 1689-90).

On August 25, 2020, State agency consultants Lynne Torello, M.D., and Aracelis Rivera, Psy.D., reconsidered the evidence, including additional records dated through July 15, 2020, adopted the RFC rendered in the prior decision, and determined Ms. Martin was not disabled. (Tr. 392).

11

## IV.    ADMINISTRATIVE HEARING

Ms. Martin testified she filed for disability because of her depression and anxiety. (Tr. 335). During periods of depression, Ms. Martin cannot get out of bed. (Tr. 335-36). She endorsed fatigue, mood swings, changes in appetite, and random crying spells for weeks at a time. (Tr. 336). Ms. Martin also endorsed symptoms of anxiety, including panic attacks that vary in intensity and duration. (*See* Tr. 336-37). When she has a "little anxiety attack," she has difficulty leaving her bedroom. (Tr. 336). She recovers from these panic attacks after a nap. (*Id.*). During a more intense anxiety attack, Ms. Martin must actively control her breathing, and experiences increased heartrate, racing thoughts, shaking, sweating, and difficulties with focus. (*Id.*). Ms. Martin described having an intense anxiety attack a month before the hearing where she attempted to visit the grocery store across the street and could not leave her apartment. (Tr. 336-37). Intense anxiety attacks can last for an hour to an hour and a half and require three to four days of recovery time because they leave Ms. Martin exhausted and zapped of energy. (Tr. 337).

Ms. Martin avoids talking to people on the phone. (Tr. 337). She endorsed being unable to complete an interview over the phone; she started crying, getting shaky, and could not answer any questions asked of her. (*Id.*).

Ms. Martin testified her mental health medications are adjusted often to address symptoms. (Tr. 338). She has an pill she takes if her anxiety comes on unexpectedly that put her to sleep in five to ten minutes. (*Id.*). Ms. Martin is easily overwhelmed by everyday activities. (Tr. 339). For instance, she must plan her showers and shopping excursions days in advance. (*Id.*). She plans to go to the grocery store across the street before 2:30 p.m. and will not go if there are too many cars in the parking lot. (*Id.*). If she walks into the grocery store and does not see the regular

12

cashiers, she gets panicky and must leave. (*Id.*). For any other grocery store, Ms. Martin must be with someone else. (Tr. 339-40). Even then, she can become overwhelmed with how many people are in the store. (Tr. 340). She does not go to the grocery store around the holidays because she knows there will be too many people in the store for her to handle. (*Id.*).

Ms. Martin had carpal tunnel release surgery that initially relieved all symptoms. (*Id.*). Over time, she noticed sharp pains in her palms and thumbs. (*Id.*). After surgery, Ms. Martin had physical therapy for her hands but now has an appointment with her primary care physician to request more therapy. (Tr. 346). Since the surgery, Ms. Martin has difficulty buttoning her coat, picking up coins from a table without pain, and holding silverware to eat hurts. (Tr. 347). Ms. Martin endorsed journaling every night for her mental health, but she can only write for about five minutes before her hand begins aching. (Tr. 340). As part of her therapy, Ms. Martin must accomplish at least one task a day regardless of her circumstances—cooking dinner. (Tr. 342). Ms. Martin can wash dishes after a meal but usually cannot hold the silverware to wash and must do the washing in stages. (Tr. 341). For instance, Ms. Martin will wash plates and bowls first and will rest her hands for a couple of hours before washing the pots and pans, for which she needs a firmer grip. (*Id.*). If her hands are not too tired by this stage, she will try to wash the silverware but is unable to most nights. (*Id.*). Even with rest breaks, she sometimes wakes up with stiff, painful hands. (Tr. 347).

Ms. Martin lives in an apartment with on-site laundry facilities downstairs. (*Id.*). She will plan days to do the laundry, but sometimes, she cannot leave the apartment. (*Id.*). Ms. Martin used to perform other household chores, like cleaning floors and bathrooms, but no longer does so because it becomes overwhelming for her. (*Id.*). Her counselor has encouraged her to start breaking

13

chores into sections, but Ms. Martin still feels overwhelmed with the prospect. (Tr. 343). Her mother does the cleaning. (*Id.*).

On a typical day, Ms. Martin is up by 9:00 a.m. (*Id.*). She watches television but avoids the news because it takes her down "a bad road." (*Id.*). She uses the whole day to plan dinner because she needs to get her mind together to "actually get up and cook dinner." (*Id.*). Ms. Martin makes a pot of coffee, washes any remaining dishes from the night before, prepares food for dinner, and is back and forth to the couch throughout. (Tr. 343-44). Usually, she makes herself go downstairs to get the mail at 2:30 p.m. but has not been able to accomplish this in past few weeks. (Tr. 344). She watches television until she starts cooking dinner around 3:00 or 3:30 p.m. (*Id.*). If Ms. Martin's niece is staying with her and her mother during the week, her niece will help Ms. Martin with household chores. (Tr. 344-45).

At the time of the hearing, Ms. Martin endorsed trying to figure out the best time to take her amitriptyline to avoid side effects, including nodding off about an hour after waking up in the morning. (Tr. 347).

The VE then testified. The ALJ asked if a hypothetical individual of Ms. Martin's age, education, and experience could perform if limited to medium exertion work and additionally restricted as follows: never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; limited to frequently handling and fingering bilaterally; avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights; routine tasks with no strict time demands and no strict production quotas; no more than routine and predictable changes in the work-setting; no direct work-related interaction with the public; occasionally interaction with supervisors; and occasional superficial interaction with coworkers.

14

(Tr. 349-50). The VE identified three medium exertion, unskilled jobs with an SVP 2: (1) hand packager, DOT #920.586-010, approximately 300,000 jobs in the national economy; (2) order puller, DOT #922.687-058, approximately 200,000 jobs in the national economy; and (3) kitchen helper, DOT #318.687-010, approximately 800,000 jobs in the national economy. (Tr. 350).

If the hypothetical individual were limited to light exertion work under the same limitations and additionally limited to occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling, the individual could perform the following unskilled, SVP 2 positions: (1) housekeeping cleaner, DOT #323.687-014, approximately 500,000 jobs in the national economy; (2) mail clerk, DOT #209.687-026, approximately 140,000 jobs in the national economy; and (3) office helper, DOT #239.567-010, approximately 120,000 jobs in the national economy. (Tr. 350-51).

If the individual were further limited to occasional bilateral grasping and handling, the VE testified all work, even sedentary positions, would be excluded. (Tr. 351).

Additionally, the VE testified employers tolerate no more than 15% time off-task and less than two days per month of absences. (Tr. 352).

In a closing statement to the ALJ, Ms. Martin's counsel emphasized the grasping and handling limitations and limitations that would result in more than the tolerated off-task behavior and absenteeism and noted the limitations were consistent with both Ms. Martin's testimony and the VE's testimony. (*Id.*).

### The ALJ's Decision

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 14, 2020, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairment: carpal tunnel syndrome, osteoarthritis, obesity, a depressive disorder, and an anxiety disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant cannot climb ladders, ropes, or scaffolds, but can frequently climb ramps and stairs. The claimant can frequently stoop, kneel, crouch, and crawl. The claimant is limited to frequent handling and fingering bilaterally. The claimant should avoid concentrated exposure to hazards, such as dangerous machinery, and unprotected heights. The claimant is further limited to routine tasks with no strict time demands, no strict production quotas, and no more than routine and predictable changes in the work setting. The claimant is limited to no direct work-related interaction with the public, occasional interaction with supervisors, and occasional superficial interaction with coworkers.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on September 6, 1977, and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

8.      The claimant has at least a high school education (20 CFR 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, since April 14, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 307-15).

16

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

Even if substantial evidence supports the decision, a district court will not uphold that decision when the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision ... will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right"); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004) (Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights). Furthermore, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11:13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Martin claims the ALJ did not properly analyze her handling limitations and, in the process, used outdated evidence. (Pl.'s Br., ECF #14, page 1).[2] Additionally, she claims the ALJ

---

[2] Ordinarily, citations to the case record are based on the PageID of the document, which appears in the header stamped on every document filed with the Court. During preparation

erred in her analysis of Nurse Practitioner Erin Murphy's opinion. (*Id.*). The Commissioner responds that substantial evidence supports the RFC's limitation to frequent handling and the ALJ's evaluation of NP Murphy's opinion. (Comm'r's Br., ECF #15, page 7, 11). I address each argument in turn.

## A.  The ALJ properly analyzed Ms. Martin's handling limitations.

Ms. Martin claims that "substantial evidence supports a further limitation than what was determined by the ALJ" (ECF #14 at page 12). In addition, she asserts the medical evidence on which the ALJ relied to evaluate her RFC was out of date. (*Id.*). Finally, Ms. Martin emphasizes the physical capacity evaluation performed by the occupational therapist, claiming the "opinion was based upon the testing that was performed during the functional capacity assessment, and was far more relevant—and persuasive—than five-year-old opinions." (*Id.* at page 15) (cleaned up). For the reasons that follow, I disagree with Ms. Martin and conclude the ALJ's decision to include a limitation to frequent bilateral handling and fingering is supported by substantial evidence.

The ALJ analyzed Ms. Martin's physical impairments as follows:

> The claimant had a diagnosis of carpal tunnel syndrome, worse on the left than the right, with little relief from injections. The claimant alleged an impairment from osteoarthritis but imaging showed only mild degenerative changes to her hands. In August of 2019, the claimant had positive signs for carpal tunnel syndrome but retained full range of motion in the upper extremities, with intact sensation. The claimant underwent carpal tunnel releases in November of 2019; she reported improvement but some residual soreness, numbness, and tingling in the left hand. In January of 2020, the claimant reported some nerve discomfort in her left fingers, and some stiffness of the wrist but did not have pain. The claimant next presented to occupation[al] therapy, in October of 2020, alleging left hand weakness. The claimant was able to return to most normal activities, and was better with pacing

---

of this Memorandum Opinion and Order, the CM/ECF system has temporarily ceased displaying headers on some filed documents. When this opinion was drafted, the issue had not been resolved. Therefore, citations to the parties' briefs are to the PageID when displayed, but otherwise are to the page number of the document.

> herself. The claimant was discharged from occupational therapy after five visits for achieving program goals and maximal benefit.

(Tr. 311). The ALJ also acknowledged the physical capacity evaluation performed by the occupational therapist. (Tr. 313). In accordance with the regulations, the ALJ appropriately noted that occupational therapists are not acceptable medical sources who can give medical opinions; instead, information from such sources may be used only to show the severity of the claimant's impairments and how they affect the claimant's ability to function. (*Id.*; *see* 20 C.F.R. 416.913(a)(3)).

Ms. Martin's first point, that substantial evidence supports further limitation, is unpersuasive because the standard of review of social security disability appeals limits the district court to determining whether substantial evidence supports the ALJ's decision. If it does, the court must defer that finding even if substantial evidence in the record supports another conclusion. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). Therefore, even if the evidence Ms. Martin cites constitutes substantial evidence supporting a limitation to occasional bilateral handling, I must defer to the ALJ's contrary conclusion so long as it too is supported by substantial evidence.

Ms. Martin's second argument—the evidence the ALJ relied on to support her decision was stale—is equally unpersuasive. She claims "[t]he opinions were based upon the decision of the prior ALJ [] from February 27, 2019, where the ALJ relied upon an opinion from October 6, 2016 in assessing [her] [RFC]." (ECF #14 at Page 14). She argues remand is required because the ALJ's limitation to frequent fingering and handling was based on an "outdated source opinion that did not include a consideration of a critical body of evidence," and the ALJ "should fulfill his [] obligation to develop the record" by ordering additional opinion evidence. (ECF #14 at Page 14).

21

In certain situations, a consultation or examination may be necessary to develop the record fully. In *Deskin v. Comm'r of Soc. Sec.*, the court held:

> [When] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (citation and internal quotation marks omitted). In light of subsequent negative treatment from other district courts, *Kizys v. Comm'r of Soc. Sec.*, No. 3:10cv25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), clarified that *Deskin* is "not ... a bright-line test" and "potentially applies only when [1] an ALJ makes a finding of work-related limitations based on no medical source opinion or [2] an outdated source opinion that does not include consideration of a critical body of evidence." *Id.* at *2. Here, neither alternative applies.

First, the bilateral handling limitation was based on two medical opinions, both from the State agency medical consultants. On initial review, the State agency consultants reviewed medical evidence through June 2020, post-dating the February 2019 decision, and concluded the new evidence did not substantiate a change from the RFC declared in that prior decision. (Tr. 382-83). On reconsideration, the State agency consultants reviewed medical evidence through July 2020 and likewise concluded the new evidence did not support further limitations. (Tr. 391). Thus, Ms. Martin has not demonstrated the bilateral handling limitation was based on no medical source opinion.

Second, Ms. Martin has not shown the ALJ failed to consider a critical body of objective medical evidence post-dating the State agency medical consultants' opinions. The only evidence

related to Ms. Martin's hands and wrists post-dating those opinions are (i) the physical capacity assessment, performed by the occupational therapist and dated September 2020, and (ii) treatment notes from occupational therapy visits from October to November 2020. By her fourth therapy visit, Ms. Martin reported returning to most normal activities and was better with pacing herself, and she was discharged from occupational therapy after five visits for achieving program goals and maximal benefit, facts the ALJ emphasized in her decision. (*See* Tr. 311). Unlike the two years of medical treatment in *Deskin*, only four months of medical evidence followed the final State agency review of Ms. Martin's medical records. Under similar circumstances, other courts have declined to remand for updated medical opinions. *See, e.g.*, *Jackson v. Comm'r of Soc. Sec.*, 4:13-CV-929, 2014 WL 2442211, at *7–8 (N.D. Ohio May 30, 2014) (distinguishing *Deskin* on the grounds that less than one year of medical evidence followed the final State agency review of claimant's medical records and that evidence showed some improvement); *Raber v. Comm'r of Soc. Sec. Admin.*, 4:12 CV 97, 2013 WL 1284312, at *17 (N.D. Ohio Mar. 27, 2013) (distinguishing *Deskin* because "the evidence related to [Raber's] condition after the consultative review covered roughly eleven months and showed she was reporting improvement or relief through treatment and did not want surgery.").

Given the foregoing, I conclude the ALJ did not err by failing to order additional opinion evidence and her determination that Ms. Martin is limited to occasional bilateral handling and fingering is supported by substantial evidence. Therefore, I decline to order remand based on Ms. Martin's first challenge to the ALJ's decision.

**B.**     **The ALJ's evaluation of NP Murphy's opinion is not supported by substantial evidence.**

Because Ms. Martin filed her application after March 27, 2017, the medical opinions are evaluated under the regulations found in 20 C.F.R. § 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [her] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. 20 C.F.R. at § 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[3] and consistency.[4] 20 C.F.R. § 416.920c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors,

---

[3]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[4]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3). That said, an ALJ's failure to specifically mention the words "supportability" and "consistency" does not necessarily mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021). While the new regulations may be less demanding than the former rules, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). And "because of the greater latitude afforded ALJs under the new regulations, the importance of cogent explanations is perhaps even more important." *Hardy*, 554 F. Supp. 3d at 908.

The ALJ found NP Murphy's opinion unpersuasive "because the record does not support marked impairments." (Tr. 312). Specifically, the ALJ stated "the claimant has routinely had unremarkable mental status examinations and, when compliant with medication, was euthymic and social," and cited mental health treatment records in support. (*Id.*). The ALJ adequately articulated that NP Murphy's mental status examinations, which consistently showed unremarkable thought content and process, unremarkable perceptions, appropriate insight and judgment, and grossly intact memory, did not support the opined limitations. *See Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224 (6th Cir. 2019) (concluding that ALJ did not err by relying in part on "largely normal" mental status examinations with "minimal or no impairment of memory, concentration, attention, or judgment")

Ms. Martin argues the medical records document her various reported symptoms and the difficulty she has leaving her house, including notations regarding self-isolation, and that these records are consistent with and supportive of NP Murphy's opinion. (ECF #14 at page 17). Indeed, the ALJ did consider Ms. Martin's reported self-isolation in response to stressors. (*See* Tr. 312). However, the ALJ did not explicitly discuss other notable elements of Ms. Martin's mental health records.

For example, the treatment notes described above reflect that Ms. Martin often struggled with feeling panicked "from out of the blue" and overwhelmed when expected to accomplish everyday activities, such as showering, leaving her room, putting money on her laundry card, going grocery shopping, and completing outstanding paperwork. Her testimony at the administrative hearing, which is not referenced in the ALJ's decision, comports with these notes. For example, Ms. Martin noted having an intense anxiety attack a month before the hearing resulting in her

being unable to leave her apartment to get groceries. She also described the narrow circumstances when she can successfully grocery shop on her own—before 2:30 p.m., not too many cars in the parking lot, and familiar employees. Substantial evidence must take into account whatever the record fairly detracts from its weight. *Brooks*, 531 F. App'x at 641.

The ALJ appropriately considered Ms. Martin's normal mental status examinations in evaluating the persuasiveness of NP Murphy's medical opinion. At the same time, the ALJ appears not to have accounted for a considerable body of additional evidence concerning Ms. Martin's mental health conditions. Without further explanation, I am left to guess whether the ALJ considered and reasonably rejected the evidence or simply ignored it. As such, I conclude the ALJ has not built a logical bridge between her analysis and her conclusions, leaving me unable to conduct a meaningful review of the ALJ's decision. *See Hopkins v. Comm'r of Soc. Sec.*, 1:07-cv-964, 2009 WL 1360222, at *14 (S.D. Ohio May 14, 2009) ("The ALJ may not ignore evidence favorable to the plaintiff. Rather, he must articulate the evidence accepted or rejected when making a disability finding to enable the court to engage in meaningful judicial review ... when, as in this case, the ALJ fails to mention rejected evidence, the Court is unable to determine if significant probative evidence was not credited or simply ignored."). Therefore, I conclude the case must be remanded for additional proceedings consistent with this opinion.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, I

**REVERSE** the Commissioner's decision denying supplemental security income and **REMAND**

this matter for proceedings consistent with this opinion.

Dated: April 6, 2023

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE